UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY A. MANON,

      Plaintiff,

v.                                           Case No. 04-73649
                                            Honorable Patrick J. Duggan

CORPORATE SOLUTIONS, LLC,
STEVEN A. RICHARD, ROBERT A.
MARKLEY, JR., and PROSOFT
TECHNOLOGIES, INC.

      Defendants.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 23, 2005.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

This lawsuit arises from plaintiff Jeffrey Manon's unsuccessful attempt to purchase defendant Corporate Solutions, LLC ("Corporate Solutions") in December 2003 through January 2004, and Corporate Solutions eventual sale to defendant ProSoft Technologies, Inc. ("ProSoft") in February 2004. On August 17, 2004, plaintiff Jeffrey Manon ("Manon") filed this lawsuit in state court against defendants Corporate Solutions, Steven Richard ("Richard"), and Robert Markley, Jr. ("Markley"). In his Complaint, Manon alleges the following claims: (1) breach of contract - exclusivity provision; (2)

1

breach of contract - oral agreement; (3) breach of implied covenant of good faith and fair dealing; (4) breach of implied-in-fact contract; (5) detrimental reliance; (6) fraud and material misrepresentation; and, (7) punitive damages. Corporate Solutions, Richard, and Markley removed the action to this Court on September 20, 2004. On March 11, 2005, Manon filed a First Amended Complaint in order to add a tortious interference claim against defendant ProSoft.

Presently before the Court is a motion for summary judgment filed by Corporate Solutions, Richard, and Markley (hereafter "defendants") on November 1, 2005.[1] The Court held a hearing on the motion on December 19, 2005.

## I.  Factual Background

On November 21, 2003, Richard as President of Corporate Solutions, Markley as its Vice President, and Manon signed a Letter of Intent concerning Manon's purchase of Corporate Solutions. *See* Mot. Ex. B. The Letter of Intent contains an "Exclusivity" provision, which reads:

> Buyer [Manon] and CS [Corporate Solutions] acknowledge
> that Buyer will expend significant resources and incur
> substantial costs in connection with its due diligence review
> of CS and the negotiation of the Acquisition. To induce buyer
> to move forward with its due diligence and the Acquisition,

---

[1] ProSoft also filed a motion for summary judgment on November 1, 2005, to which Manon filed a response indicating that he agrees ProSoft "is not a proper party defendant" and that he "does not oppose the dismissal" of ProSoft. The parties thereafter submitted a stipulated order granting ProSoft's motion for summary judgment and dismissing Manon's claim against ProSoft, which this Court signed on December 16, 2005.

> CS and its members agree that until December 31, 2003, CS and its members shall negotiate exclusively with Buyer concerning the possible sale of the assets of CS or the business of CS and that no member or other agent or employee of CS will, directly or indirectly, solicit proposals or indications of interest from, enter into negotiations with, provide information to, or enter into a transaction with, any other person, firm or corporation regarding an acquisition of the assets or membership interests of CS or the business of CS.  In the event that either CS or its members breach this paragraph 5 and Buyer, CS or its members terminate the negotiations with respect to the Acquisition, then in addition to any other remedies available to Buyer at law or in equity as a result of such breach, CS shall immediately reimburse Buyer for all of the reasonable costs and expenses incurred by it (including without limitation the reasonable costs and expenses of its attorneys, accountants, and consultants) in connection with its due diligence review of CS and its negotiations with respect to the Acquisition.  The obligations of CS and its members to negotiate exclusively with Buyer shall terminate upon the earliest of (a) the date on which Buyer ceases to conduct its efforts with respect to the Acquisition in good faith if CS has provided Buyer with five (5) days written notice of CS and its members' intention to terminate exclusive negotiations with Buyer as a result thereof; or (b) the date on which Buyer notifies CS in writing of Buyer's decision to discontinue negotiations with respect to the Acquisition.

*See id*. ¶ 5.  Another paragraph of the Letter of Intent provides that a closing "shall occur no later than December 31, 2003 unless agreed by both parties."  *See id* ¶ 9.  In paragraph 10, a section entitled "Best Efforts to Obtain Satisfaction of Conditions," the Letter of Intent states in part, that "[t]he parties will use their good faith, best efforts to enter into a definitive acquisition agreement and related contracts as soon as practicable (but not later than 45 days after acceptance of this Letter of Intent) . . ."  *See id*. ¶ 10.  Finally, as

relevant to defendants' motion, the Letter of Intent contains the following language with regard to the binding nature of the obligations set forth therein:

> Except for the obligations contained in paragraphs 5, 6 and 7 above[2] which the parties intend to be legally binding obligations, this Letter of Intent is not intended to create legally binding obligations of the parties hereto and none of the parties will be legally bound until the execution and delivery of a mutually agreeable definitive purchase agreement. If a definitive purchase agreement is not signed by 12/31/2003, then all obligations of either party under Paragraphs 5, 7 and 13 are automatically terminated.

*See id.* ¶ 12.

Following the parties' execution of the Letter of Intent, Manon began to perform his due diligence and the parties continued to negotiate the terms of a purchase agreement. Meanwhile, on Friday December 12, 2003, Rahul Jindani ("Jindani")– an individual who previously expressed an interest in purchasing Corporate Solutions but had discontinued discussions in October 2003– sent an e-mail to Corporate Solutions' broker and Markley stating his renewed interest in purchasing the company. *See* Resp. Ex. 37. Less than an hour after receiving Jindani's e-mail, the broker responded as follows: "We have a closing with another buyer set for 12/31. Should that change, we will be in touch . . ." *See id.* Ex. 38. However on Monday, December 13, Richard sent the following e-mail to Jindani:

---

[2]Paragraph 6 requires the parties to keep the existence of the letter and its contents confidential. *See* Mot. Ex. B ¶ 6. In general, paragraph 7 requires CS to operate its business on a basis consistent with past practices during the pendency of negotiations with Manon. *See id.* ¶ 7.

> I would say we are still interested. But we are working with another company with a target close date of 12/31/03. There [sic] offer is $1 million upfront, plus cash & receivables with earn outs in the subsequent 3 years. If you can revise your offer to compete with theirs, then we would reconsider it. Also, we would want to close pretty quickly . . .

*See id*. Ex. 39. Richard sent Markley and Corporate Solutions' broker a copy of this e-mail. *See id*.

Jindani responded to Richard's e-mail on December 15, informing Richard that he can close quickly and that his "starting point is 500k upfront." *See id*. Ex. 40. Jindani then inquired as to whether he should send a proposal to Corporate Solutions or whether Corporate Solutions would send one to him. *See id*. Later that day, Richard sent Jindani an e-mail asking Jindani "to send us what you have." *See id*. Ex. 41. In response, Jindani sent Richard an e-mail outlining his proposal to acquire Corporate Solutions. *See id*.

On December 17, 2003, at 3:23 p.m., Richard sent an e-mail to Jindani stating that he had reviewed Corporate Solutions' Letter of Intent with Manon and "cannot talk with any other potential buyer at this time." *See id*. Ex. 42. Less than an hour later, however, Richard sent another e-mail to Jindani with a proposed deal structure and updated financial information. *See id*. Ex. 43. At 6:25 p.m., Jindani sent Richard a response containing some corrections and counter-proposals. *See id*. Ex. 44.

On December 18, Richard sent Jindani an e-mail stating that he and Markley "reviewed your last email [sic], and it looks agreeable." *See id*. Ex. 45. In order "[t]o move the process along," Richard proposes in this e-mail that Jindani prepare a revised

5

Letter of Intent– although Richard notes that "we will not be able to sign the [Letter of Intent] until after December 31, 2003"– and that Jindani begin working on the Purchase Agreement and Employment Agreement. *See id.* With respect to the Purchase Agreement, Richard indicates that he and Markley "took the Draft Purchase Agreement for the current offer we are considering, and then tried to insert comments/text to reflect your offer." *See id.* Apparently Richard attached a copy of this edited draft purchase agreement to this e-mail, as he further suggests that Jindani's "lawyers work from this," noting that "we can save a lot of time and money, because our lawyers have already reviewed this document and we are fine with most of it . . ." *See id.*

While defendants continued to negotiate with Jindani, they continued to finalize a deal with Manon. According to an e-mail from Manon's attorney to Corporate Solutions' attorney on January 8, 2004, two major open issues remained as of that date. *See id.* at 49. In the e-mail, Manon's attorney proposed a compromise with regard to those issues. Markley sent an e-mail to Manon in response on January 9, 2004, stating that he and Richard are working with their lawyer "to get our best and final offer on the table . . ." and that "[w]e are still VERY committed to this deal . . ." *See id.* Ex. 49 (emphasis in original). Later that day, Corporate Solutions' counsel sent "Corporate Solutions' best and final proposal" to Manon's counsel via e-mail. *See id.* Ex. 50. The following day, January 10, Manon sent an e-mail to Markley indicating that Manon will have his attorney "draft the final wording." *See id.* Ex. 51. Manon further states: "We remain very interested in finalizing this as quickly as possible and to that end I have advised our

Banker of the status and ask him to be ready to close as soon as we finalize the document." *See id*.

On Monday, January 12, Markley sent an e-mail to Manon asking whether Manon had "[a]ny word back from your lawyer or accountant on the final language." *See id*. Ex. 53. According to Manon, a deal subsequently was reached by the parties and a final "Execution Copy" of the Asset Purchase Agreement thereafter was prepared and sent to Corporate Solutions. *See id*. Manon Aff. ¶ 5. The parties then scheduled a closing for January 29, in Pittsburgh (where Corporate Solutions' offices are located). *See id*.

In the meantime, on January 26 at 12:08 p.m., Jindani e-mailed Corporate Solutions his "final offer" "[b]ased on the analysis and discussions over a period of last [sic] few weeks." *See id*. Ex. 59. Jindani further writes: "Please let me know if you disagree with what is documented above. I will assume that we have an agreement on the final offer and we will work on trying to get a closure on 2/2/2004, if we can close on all documentation by 1/29." *See id*. Three minutes later, Richard responds to Jindani's e-mail writing simply "[a]greed." *See id*. On January 27, Richard and Markley telephoned Manon and told him that they no longer desired to proceed with the closing or the transaction. *See id*. Manon Aff. ¶ 7.

On February 2, 2004, Corporate Solutions and Jindani closed on their deal. Manon subsequently learned of the sale through press releases. *See id*. ¶ 7.

**II.     Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### III. Applicable Law and Analysis

#### A. Breach of Contract - Exclusivity Provision

Defendants contend that Manon's breach of contract claim based on the exclusivity provision is factually flawed because the parties were not able to consummate a mutually agreeable definitive acquisition agreement before the Letter of Intent expired on December 31, 2003. Manon responds that nothing in the Letter of Intent makes the exclusivity provision dependant upon the execution of a purchase agreement. The Court agrees with Manon.

The plain language of the exclusivity provision requires Corporate Solutions and its members, until December 31, 2003, to negotiate exclusively with Manon and prohibits Corporate Solutions and its members from providing information to other persons, firms or businesses. *See* Mot. Ex. B. ¶ 5. While paragraph 12 of the Letter of Intent provides that certain obligations within the Letter of Intent are not intended to create legally binding obligations of the parties until the execution and delivery of a mutually agreeable definitive purchase agreement, the paragraph specifically exempts the obligations contained in the exclusivity provision as well as the obligations contained in paragraphs 6 and 7. *See id.* ¶ 12. Paragraph 12 also provides that the exclusivity provision automatically terminates if a definitive purchase agreement is not signed by December 31, 2003; however, Manon's breach of contract claim is not premised on a breach occurring after that date. In other words, Manon contends that defendants breached the exclusivity provision in mid-December while that provision was legally binding. Therefore the Court holds that nothing in the terms of the Letter of Intent renders that breach unenforceable due to the parties' failure to execute a purchase agreement. As the Court finds sufficient

9

evidence in the record to create a genuine issue of material fact with respect whether defendants breached the exclusivity provision, the Court concludes that defendants are not entitled to summary judgment with respect to Manon's breach of contract claim.

### B. Breach of Oral Contract

Defendants interpret Count Two of Manon's First Amended Complaint as alleging that an oral agreement to continue exclusive negotiations was created after December 31, 2003, by virtue of the parties' continued negotiations, and that defendants breached that oral agreement. In their motion for summary judgment, defendants argue that Manon cannot maintain a breach of oral contract claim alleging violations of the exclusivity provision after December 31, 2003. This Court agrees with defendants as there is no evidence establishing the parties' mutual intent to continue the exclusivity provision beyond the termination of the Letter of Intent. According to Manon, however, his breach of oral contract claim is not premised on a breach of the exclusivity provision but rather on defendants' breach of the final asset purchase agreement orally reached by the parties in January 2004. Even assuming that the allegations in Manon's First Amended Complaint support his interpretation of this claim, the Court finds that defendants still are entitled to summary judgment.

Manon contends that the parties reached a final deal with respect to his purchase of Corporate Solutions in January 2004. Although the agreement was never formalized in an executed written contract, Manon argues that it nevertheless is enforceable. Manon acknowledges that the parties always intended the final asset purchase agreement to be in

writing, *see* Mot. at 9 (citing Ex. A at 85-86); however he argues that a written agreement never was executed due to defendants' unilateral actions. Citing Michigan case law, Manon argues that "where conditions exist before contractual performance is required, a party may not avoid liability by relying on the failure of a condition precedent where that party has caused the failure." *See* Resp. at 14.

Michigan law also provides, however, that if one party manifests an intent not to be bound until execution of a written contract, no contract arises absent the execution of such a contract. *Angelo DiPonio Equip. Co. v. State of Michigan, Dep't of State Highways & Transp.*, 107 Mich. App. 756, 761, 309 N.W.2d 566, 568 (1981)(citing *Mich. Broad. Co. v. Shawd*, 352 Mich. 453, 90 N.W.2d 451 (1958)). Stated differently, "if the parties indicated that the expected or proposed contract was to be the exclusive, operative consummation of the negotiations, the preceding communications would not be operative as an offer or acceptance." *Id.*; *see also* 1 WILLISTON ON CONTRACTS § 4:8 (4th ed. 2005). As explained in Williston, an oral agreement will be complete and binding where the parties simply intend to prepare a writing to memorialize the agreement; however, where the parties "mean to have [all the terms] reduced to writing and signed before the bargain shall be considered as complete, neither party will be bound until that is done . . ." 1 WILLISTON ON CONTRACTS § 4:8 (4th ed. 2005).

In this case, the Letter of Intent expressly states that the parties do not intend to be legally bound "until the execution and delivery of a mutually agreeable definitive purchase agreement." *See* Mot. Ex. B ¶ 12. Although the Letter of Intent expired on

11

December 31, 2003, the undisputed evidence demonstrates that the parties continued to operate under a belief that a written and executed Asset Purchase Agreement was necessary to finalize their contract.  In fact, toward the end of January the parties worked on preparing a final written Asset Purchase Agreement and scheduled a closing to execute that document. Therefore the Court concludes that absent the execution of a mutually agreeable definitive purchase agreement, there is no contract enforceable against defendants.  In other words, any alleged oral agreement is not enforceable.  Accordingly, the Court concludes that defendants are entitled to summary judgment with respect to Manon's breach of oral contract claim.

### C.     Breach of Implied Duty of Good Faith and Fair Dealing

In Count Three of his First Amended Complaint, Manon alleges that an implied covenant of good faith and fair dealing arose from the Letter of Intent and the parties' dealings after December 31, 2003.  Manon further alleges that defendants breached the covenant by entering into negotiations with ProSoft while the exclusivity provision was in effect, failing to execute the agreed upon Asset Purchase Agreement and employment agreements, and failing to inform Manon that they terminated negotiations because they were negotiating with ProSoft.  Defendants seek summary judgment with respect to this claim, arguing that Michigan does not recognize an independent action for breach of an implied covenant of good faith and fair dealing.

Manon responds that Michigan recognizes such a cause of action when a party to a contract makes the manner of its performance a matter of its own discretion.  It appears

that Manon is correct.³ *See Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 876-77 (5th Cir. 1989)(citing *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 357 N.W.2d 669 (1984) and *Burkhardt v. City Nat'l Bank of Detroit*, 57 Mich. App. 649, 226 N.W.2d 678, 680 (1975)). Nevertheless, Manon's claim fails for the following reasons. According to Manon, the implied covenant of good faith and fair dealing which defendants allegedly breached arose from the parties' oral contract. *See* Resp. at 20. As Manon explains in his response: "[p]erformance of the [parties' oral] contract was discretionary in the sense that, unless the parties appeared at the closing and completed the transaction, the business [Corporate Solutions] would remain in [d]efendants' hands." *See id.* As the Court has found no binding oral contract between the parties, it concludes that defendants are entitled to summary judgment with respect to Manon's claim alleging breach of an implied covenant of good faith and fair dealing arising from that alleged contract.

---

³As the Fifth Circuit held in *Hubbard Chevrolet*, "Michigan common law . . . recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts." 873 F.2d at 876. The *Hubbard* court explained that "the implied covenant of good faith and fair dealing essentially serves to supply limits on the parties' conduct when their contract defers decisions on a particular term, omits terms or provides ambiguous terms." 873 F.2d at 876-77 (citations omitted). For example in *Burkhardt*, where the parties' contract failed to specify which accounting procedure would be used to determine the amount of the plaintiffs' escrow payments, the court found that the mortgage agreement implies a duty on the defendant bank to choose a method in good faith. 57 Mich. App. 649, 652 (1975). As the Fifth Circuit further explained, however, "Michigan law does not imply the good faith covenant where parties 'have unmistakably expressed' their respective rights." *Hubbard Chevrolet*, 873 F.2d at 877 (internal citations omitted).

13

### D. Breach of Implied-in-Fact Contract and Detrimental Reliance

In Count Four of his First Amended Complaint, Manon alleges that "[t]he words and conduct of [d]efendants Corporate Solutions, Richard, and Markley toward the [p]laintiff *on and after January 1, 2004* constituted an implied promise of exclusivity in dealings with [p]laintiff." *See* Compl. ¶ 37 (emphasis added). According to Manon, defendants breached this implied promise when they negotiated and reached a final deal with Jindani. In Count Five, Manon alleges that he detrimentally relied on defendants' implied promise of exclusivity. *See id*. ¶¶ 42-43. Defendants argue that they are entitled to summary judgment with respect to these claims because there is no evidence of an agreement requiring defendants to negotiate exclusively with Manon after December 31, 2003.

In his response, Manon argues that defendants "incorrectly assume" that the promise he seeks to enforce is a promise to continue to deal exclusively after December 31, 2003. *See* Resp. at 18-19. According to Manon, Counts Four and Five actually are premised on the parties' oral contract and defendants' promise pursuant to that contract to sell Corporate Solutions to Manon. *See id.* Defendants' interpretation of Manon's claims, however, is not simply based on their assumption that Manon is alleging a breach of an implied promise to deal exclusively after December 31, 2003, as this is specifically what Manon alleges in his initial and amended complaints. And as defendants point out, the Letter of Intent specifically provides that the parties' agreement to negotiate exclusively with one another terminated on December 31, 2003. Manon presents no

14

evidence from which the trier of fact could find that defendants agreed to extend the exclusivity provision beyond that date. The Court therefore concludes that defendants are entitled to summary judgment with respect to Manon's breach of implied-in-fact contract claim and detrimental reliance claim, as those claims presently are alleged in his First Amended Complaint.[4]

### E.     Fraud and Material Misrepresentation

In Count Six of his First Amended Complaint, Manon alleges that defendants "made false representations to [p]laintiff regarding these [d]efendants' intent to enter into an agreement for the sale of Corporate Solution, LLC's assets to [p]laintiff." *See* Compl. ¶ 46. Defendants interpret Manon's claim as alleging that defendants fraudulently misrepresented their intent to deal exclusively with Manon when they executed the Letter of Intent on November 21, 2003. Manon responds by arguing that defendants again have

---

[4] Manon cannot simply amend his breach of implied-in-fact contract claim and detrimental reliance claim by stating those claims differently in his response to defendants' motion for summary judgment. *See Tucker v. Union of Needletrades, Indus., and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)(relying on *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) to uphold the district court's refusal to consider a claim raised by the plaintiff in response to a motion for summary judgment when that claim was not included in the plaintiff's complaint). As the *Gilmour* court stated, the liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage . . . At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Federal Rule of Civil Procedure] 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." 382 F.3d at 1314-15 (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Manon has not filed a motion to amend his First Amended Complaint.

missed the underlying basis of his claim.  *See* Resp. at 21.  Manon states that his fraud claim is premised on Richard's and Markley's representations when the Letter of Intent was executed that they are "members" of Corporate Solutions.  *See id*.  Manon argues that these representations were material because the Letter of Intent was intentionally made binding as to Corporate Solutions and its members to assure that additional assets secured the binding promises therein.  *See id*.

The allegations in Manon's initial and amended complaints in no way support Manon's current interpretation of his fraud and misrepresentation claim.  In any event, Manon's counsel indicated at the motion hearing that Manon only is interested in pursuing his fraud and misrepresentation claim *if* Markley and Richard assert that they cannot be held individually liable for breach of the exclusivity provision because they are not "members" of Corporate Solutions.  In response, defendants' counsel represented that Richard and Markley will not make such an argument.  The Court therefore will grant defendants' motion for summary judgment with respect to this claim.

### F.     Punitive Damages

Defendants argue that Manon is not entitled to punitive damages because this is a commercial contract case without tortious conduct independent of the breach. As the Michigan Supreme Court has held, "absent allegation and proof of tortious conduct existing independent of the breach . . . exemplary [i.e. punitive] damages may not be awarded in common-law actions brought for breach of a commercial contract." *Kewin v. Mass. Mutual Life Ins. Co.*, 409 Mich. 401, 420-21, 295 N.W.2d 50 (1980)(internal

citations omitted). Manon responds that his fraud claim alleges tortious conduct independent of his breach of contract claim and therefore his claim for punitive damages should survive summary judgment if his fraud claim survives. As set forth previously, however, defendants are entitled to summary judgment with respect to Manon's fraud claim. Thus the Court also will dismiss Manon's claim for punitive damages.

### G.     Other Damages

Defendants seek summary judgment with respect to Manon's request for lost profit damages. Defendants argue that Manon cannot recover any lost profits based on his inability to purchase Corporate Solutions where defendants never were legally obligated to sell the business' assets to him. As defendants state, Manon cannot claim the benefit of owning assets where defendants never were obligated to sell him those assets. This Court agrees. The Court therefore will not address defendants' additional argument that Manon lacks standing to bring a claim for lost profit damages on behalf of entities that are not parties to this action.

## IV.    Conclusion

For the above reasons, the Court holds that defendants are entitled to summary judgment with respect to all but one of the claims alleged in Manon's First Amended Complaint– his breach of contract claim based on the exclusivity provision in the Letter of Intent. Accordingly,

**IT IS ORDERED**, that the motion for summary judgment filed by defendant Corporate Solutions, Markley, and Richard is **GRANTED WITH RESPECT TO**

**COUNTS TWO THROUGH SIX AND COUNT EIGHT** and **DENIED WITH RESPECT TO COUNT ONE**.[5]

                                               s/PATRICK J. DUGGAN
                                               UNITED STATES DISTRICT JUDGE

Copies to:
Paul M. Morgan, Esq.
James R. Jeffery, Esq.
John A. Zick, Esq.

---

[5]Count Seven in the First Amended Complaint pertains to ProSoft only, which was dismissed pursuant to the Court's December 16, 2005 Order.